UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-60571-CIV-COHN

PORT EVERGLADES LAUNCH SERVICE, INC.,
d/b/a CAPE ANN TOWING & SALVAGE,

Magistrate Judge Seltzer

Plaintiff,

vs.

M/Y "SITUATIONS," its engines, tender,
tackle, equipment, furnishings, and
appurtenances, *in rem*, and SITUATIONS OF
NORTH CAROLINA, LLC, its owner, *in personam*,

Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** came before the Court for a bench trial on February 3, 9, 10,

and 11, 2011.[1]  The Court has carefully considered the credibility of the witnesses

presented and the evidence admitted during the trial.  The Court has also considered

Plaintiff's Proposed Findings of Fact and Conclusions of Law [DE 59], Defendants'

Proposed Findings of Fact and Conclusions of Law [DE 57], Defendants' Closing

Argument [DE 82] and Plaintiff's Closing Argument [DE 83].  The following findings of

fact and conclusions of law are therefore made pursuant to the requirements of Federal

Rules of Civil Procedure 52.  Any findings of fact which should be treated as

conclusions of law are to be treated as such, and any conclusions of law that should be

treated as findings of fact should also be treated as such.

_____

[1]  The testimony considered included the February 24, 2011 deposition of expert
witness H.M. Pliske [DE 84-1].

## I.  FINDINGS OF FACT[2]

1.   This action arises out of the salvage of the M/Y SITUATIONS ("Vessel") in the
     Tarpon River in Fort Lauderdale, Florida on Sunday, June 21, 2009, the Father's
     Day holiday.

2.   Plaintiff, Port Everglades Launch Service, Inc., d/b/a Cape Ann Towing &
     Salvage (hereinafter, "Cape Ann"), is a professional salvage and towing
     company and operates in Fort Lauderdale, Florida.

3.   Cape Ann has two full-time employees, Captain Courtney Day and Merrie Beth
     Day, the owners of the plaintiff corporation.

4.   Most of Cape Ann's business is providing towing services, with approximately
     one "pure salvage" (sinking vessel) job done per year since 2006, or about eight
     to ten in the company's existence.

5.   During the salvage, Cape Ann engaged two independent contractors to assist
     with the salvage and tow of the M/Y SITUATIONS.   They are Captain Jerry
     Farris and Captain Brian Stoner.

6.   The M/Y SITUATIONS is a 1988 one hundred foot Broward motor yacht bearing
     Official Number 931333.

7.   Defendant Situations of North Carolina, LLC was the owner of the Vessel on

---

[2]  Many of these findings of fact and conclusions of law are taken from the
parties' proposed findings of fact and conclusions of law [DE's 57 and 59].  A district
court must exercise "independent judgment" in adopting a party's proposed findings.
Bright v. Westmoreland Cnty., 380 F.3d 729, 731-32 (3rd Cir. 2004).  In this case, the
Court has independently analyzed the evidence presented at the bench trial, and has
adopted portions of each party's submissions.  In addition, most of the factual findings
were stipulated to by the parties in their Joint Pretrial Stipulation [DE 53].

2

June 21, 2009.

8.   Defendant Situations of North Carolina, LLC remains the current owner of the Vessel (hereinafter, "Defendants" refers to both defendants).

### A.  Cape Ann's Salvage of the M/Y SITUATIONS

9.   At approximately 7:50 am on Sunday, June 21, 2009, a jogger called the Fort Lauderdale Police Department to report that the yacht, M/Y SITUATIONS, was taking on water and sinking while moored at a dock behind the residence located at 1401 Ponce De Leon Drive, Fort Lauderdale, Florida.

10.   The Vessel was docked on the southeast side of the canal with its bow facing toward the fixed bridge at SE 9th Street.

11.   Officer Waters and Captain Phillips of the Fort Lauderdale Marine Police Unit arrived at the scene and boarded the vessel.

12.   The police officers issued a distress call on emergency VHF channel sixteen that the M/Y SITUATIONS was sinking and in need of immediate salvage service.

13.   Officer Waters and Captain Phillips obtained contact information for the Vessel's beneficial owner, Thomas Holderby, and called him to report that the Vessel was taking on water.

14.   Mr. Holderby was on vacation outside the State of Florida on June 21, 2009.

15.   At the time the police called Mr. Holderby, he was unaware that the Vessel was taking on water.

16. Additionally, the Vessel's captain was also on vacation outside of the state of Florida on June 21, 2009, and was also unaware that the vessel was taking on water.

17. Cape Ann was not monitoring channel sixteen (16) on the morning of June 21, 2009, and did not respond to the emergency call from the Fort Lauderdale Marine Police.

18. However, Officer Waters had Cape Ann's telephone number in his cellular phone and called Courtney Day directly on the phone.   Cape Ann responded and mobilized to begin the salvage of the Vessel.

19. Cape Ann's salvage truck, a 36-foot FL-70 Freightliner, valued at approximately $23,409.00 when put in service by Cape Ann in February of 2006, was used to transport Cape Ann's salvage equipment and personnel to the scene.

20. Cape Ann voluntarily undertook to provide salvage services to the M/Y SITUATIONS while moored at a dock behind the residence located at 1401 Ponce De Leon Drive, Fort Lauderdale, Florida on the Tarpon River.

21. Cape Ann had no pre-existing contractual, legal or official duty to the M/Y SITUATIONS or its owner to provide salvage services.

22. Upon Cape Ann's arrival, Captain Courtney Day noted that the M/Y SITUATIONS had taken on water and was in danger of sinking.

23. Cape Ann personnel observed that the vessel was already listing to the port side, with its bow down two to three feet below the waterline.

24. Cape Ann personnel noted that no bilge pumps were running on the M/Y SITUATIONS, and thus no water was being pumped out of the yacht.

4

25. Cape Ann personnel entered the vessel and discovered several feet of water in the bow and approximately 18" to 20" of water above the floorboards in the midship engine room.

26. Once aboard, Cape Ann personnel reported that the water was waist deep in areas.

27. Cape Ann also observed that the M/Y SITUATIONS engine room portholes were open and only 12 inches above the waterline.

28. Cape Ann placed three high-capacity, gasoline-powered Briggs & Stratton 825 Series 12,000 GPH (gallons per hour) pumps on the sinking vessel in order to begin to dewater the vessel.  These pumps were owned by Cape Ann prior to the salvage of the M/Y SITUATIONS and have been used on other salvage jobs.

29. Once Captain Day entered the engine room, he observed oil floating in the water.  Mindful that the oil containment boom had not yet been deployed, but focused on the task of beginning the dewatering process, Captain Day placed the suction line below the oil floating on the water's surface.

30. After dewatering operations had commenced, Captain Day discovered an inadequately capped fuel sounding tube in the engine room, approximately one inch from submersion.

31. The fuel sounding tube led to a fuel tank that contained approximately 4,400 gallons of diesel fuel.

32. Cape Ann also deployed five sections (250 feet) of pollution containment boom, and 50 – 100 absorbent pads.

33. Cape Ann pumped water from the interior of the M/Y SITUATIONS directly into the canal from approximately 9:00 am until the containment boom was deployed

at 9:34 am.  During this time, the pumps did not discharge into a boom or other device which would have prevented oily water from entering the marine environment.

34.   There is no direct evidence that oily water was in fact pumped into the canal outside the containment boom.

35.   After pumping out a significant amount of water, Captain Day discovered that the source of the water ingress into the Vessel was a fitting on the aft air conditioning raw water pump that had failed.

36.   Drawing upon his years of experience as a mechanical mariner and professional salvor, Captain Day was able to stop the water entering the vessel at the fitting by placing a rag over the hole and wrapping it in tape.

37.   At approximately 10:30 a.m., two of Cape Ann's tugboats, numbers One and Four, arrived on scene.

38.   The value of Tug # 1" was $28,892.00 when put in service by Cape Ann on October 3, 2008.

39.   The value of "Tug #4 was $120,561.00 when put in service by Cape Ann on February 24, 2006.

40.   Neither tug was involved with plugging the failed fitting or dewatering the yacht. The sole purpose of the tugs was towing the vessel from the residence to the boat yard.

41.   Cape Ann dewatered the vessel using its three high capacity pumps between approximately 9:00 am and 11:00am, until Cape Ann determined that it was safe to tow the Vessel.

42.   Cape Ann ensured that a salvage diver was at the ready throughout the salvage of the M/Y SITUATIONS.

43.   Cape Ann placed a pump on the deck of the M/Y SITUATIONS to continue to dewater the Vessel during the tow to Rolly Marine.  This pump discharged water directly into the waterway during the tow.  This pump did not discharge into a boom or other device which would have prevented oily water from entering the marine environment.

44.   Cape Ann was able to successfully tow the M/Y SITUATIONS to Rolly Marine.

45.   The towing portion of this operation was approximately 1 hour and 22 minutes (10:53 am to 12:15 pm).  Cape Ann demobilized from the salvage and tow operation from 12:16 until 2:00 pm.

46.   Cape Ann is a professional salvor, has previously provided salvage services as a part of its operations, and maintains several vessels and other vehicles that can be mobilized to respond to calls.

47.   Captain Day testified that Cape Ann properly disposed of the oil absorbent pads from the M/Y SITUATIONS, though Cape Ann does not have receipts or records indicating that oily waste and pollutants from the M/Y SITUATIONS operation were disposed of in manner required by the Environmental Protection Agency.

48.   During the salvage operation Cape Ann did not observe any vessels moving past the M/Y SITUATIONS dock at 1401 Ponce De Leon Drive, Fort Lauderdale, Florida.  No vessel wakes affected Cape Ann's salvage operations.

49.   The weather/sea state during the salvage portion of the operation was calm with light wind and did not affect Cape Ann's salvage operations.

50.   The weather/sea state during the towing portion of the operation was calm with light wind and did not affect Cape Ann's towing operations.

51.   Cape Ann's salvage and tow of the M/Y SITUATIONS were conducted during daylight hours.

52.   The conditions were so calm that the eight and ten year old children of Courtney and Merrie Beth Day participated in taking photos on the Vessel and their ten year old daughter was aboard the M/Y SITUATIONS during the salvage operations and towing of the vessel to Rolly Marine.

53.   Cape Ann did not put a diver in the water during the salvage of the M/Y Situations.

54.   Cape Ann did not use airbags during the salvage of the M/Y Situations.

55.   Cape Ann did not apply any type of patch to the exterior hull of the M/Y Situations.

56.   Cape Ann's standard rate for a dockside pump out was between $100.00 and $150.00 per foot plus towing charges in June of 2009.

57.   Cape Ann standard rate for towing was between $150.00 and $300.00 per hour in June 2009 depending on degree of difficulty.

58.   Towing the M/Y SITUATIONS on June 21, 2009, was a low degree of difficulty tow.

### B.  Fair Market Value of the Vessel

59.   At the time of the salvage, the M/Y SITUATIONS was listed for sale with the yacht broker Dwight Tracy & Friends for $1,550,000.00.

60.   Mr. Holderby, the vessel owner, testified at his deposition that he paid $1,025,000.00 for the Vessel in 2007, and that the vessel was insured for

$1,300,000.

61.    The market trend for Broward raised pilothouse semi-custom motoryachts with an interior and exterior volume, vintage and condition (i.e. footprint) of the M/Y SITUATIONS has been in a significant decline since 2006.  The market conditions had a negative impact on the fair market value of the M/Y SITUATIONS.

62.    Plaintiff's expert marine surveyor, H.M. Pliske, testified that the fair market value of the M/Y SITUATIONS before she began to sink was approximately $982,200.00.

63.    Pliske's methodology consisted of finding nine sale prices on a public industry website for comparable sized and aged Broward yachts, eliminating the lowest and highest values, averaging the remaining seven values, and then deducting 30% for market conditions and commissions, based upon his years of experience.  Pliske did not inspect any of the vessels he used in his average.

64.    Defendants' valuation expert, Jason Dunbar, testified that prior to the partial submersion in June of 2009 the fair market value of the M/Y SITUATIONS was approximately $552,625.  Dunbar took into account the changed market after 2006 for these types of luxury vessels, but only analyzed one similar vessel, the IBEX, which he personally visited.

65.    The Court finds that the fair market value of the M/Y SITUATIONS before the incident on June 21, 2009, is $695,816.00.  This figure reflects an amount that takes Dunbar's fair market value and adds one-third of the difference between Dunbar's figure and Pliske's figure, which the Court finds to be a reasonable amount based upon the varying methods, experience and credibility of these two

expert witnesses.

66. Although Dunbar only identified one comparable vessel, his opinion was based upon actual sale data and his physical inspection of the vessels, combined with his opinion regarding the drastic decline in value of similarly sized and aged vessels given the economic downturn in the market.  Pliske's analysis was based only upon listed prices, not actual sale prices, and he did not inspect any of the vessels to determine if they had contained internal upgrades (i.e. engines, interior design, etc.) which the M/Y SITUATIONS did not, thus resulting in higher listed sale prices.

## C.  Salved Value

67. The total cost to repair the water damage to the M/Y SITUATIONS as a result of the June 21, 2009, incident was $238,291.62.

68. Defendants' experts testified that the flow of water into the M/Y SITUATIONS at the time when Cape Ann began dewatering the vessel was approximately 4.25 gallons per minute.

69. The Court finds that if Cape Ann Marine Towing did not initiate the pump out of the Vessel, it could have remained afloat for approximately twenty-seven (27) hours, or until about noon of the following day.

70. During this twenty-seven (27) hour period, the internal water level within the Vessel would have increased by less than 1 foot.

71. Stability calculations show that the vessel would have exhibited positive stability for approximately twenty-seven (27) hours without action from Cape Ann.

72. Nicholas McPherson, the broker for the vessel owner for purposes of selling the M/Y SITUATIONS, would likely have performed a customary check on the vessel within that 27 hour period (prior to noon on Monday, the next day).  Because the vessel was tied to the dock, McPherson would have had access to land-based resources not unlike the pumps used by Cape Ann to initiate the dewatering of the vessel.

73. Additionally, the salvors were not exposed to any immediate danger associated with the vessel's stability or ability to stay afloat. It was a low risk operation, though the Court recognizes that at the time Cape Ann arrived at the scene, it could not have known this fact.

74. Because of the bow down attitude of the vessel, the likelihood of running gear damage from grounding was minimal.  Onboard the M/Y SITUATIONS, as water entered the vessel, it created bow down trim. With this bow down trim, the vessel's stern raises off of the bottom, where the vessel's running gear is located.

75. While Plaintiff overstated its initial claim and Defendants did not acknowledge that pure salvage had take place until shortly before the trial period, neither party litigated this action in bad faith.

## II.  CONCLUSIONS OF LAW

### A.  Elements of a Salvage Award

In order to obtain a salvage award, Plaintiff must prove three elements by a preponderance of the evidence:  1) a maritime peril from which the ship or the property could not have been rescued without the salvor's assistance; 2) a voluntary act by the

salvor, where he is under no official or legal duty to render the assistance; and

3) success in saving or in helping to save at least part of the property at risk.  Klein v.

Unidentified Wrecked & Abandoned Sailing Vessel, 758 F.2d 1511, 1515 (11th Cir.

1985).  The Court concludes that because the M/Y SITUATIONS was taking on water

on a Sunday morning, in an amount unknown at the time Cape Ann responded to the

Fort Lauderdale Police's request for emergency assistance, a reasonable apprehension

of peril was created.  Fort Myers Shell & Dredging Co. v. Barge NBC 512, 404 F.2d

137, 139 (5th Cir. 1968).[3]  In addition, Defendants stipulated that the "M/Y

SITUATIONS was in a position of maritime peril."  Joint Pretrial Stiplation ¶ jjj [DE 53].

Plaintiff has also proven that it provided voluntary services in that it was under no legal

duty to render assistance.  Finally, Cape Ann was able to find the source of the in-flow

of water, dewater the Vessel and tow it to safe harbor, thus succeeding in saving some

damage to the vessel, its engines, electrical panels and components.  The Court

concludes that Cape Ann did achieve some success and is entitled to a salvage award.

### B.  Calculating the Salvage Award

Admiralty courts have established elements to consider and balance when

determining the amount of the salvage award.  Atlantis Marine Towing, Inc. v. M/V

ELIZABETH, 346 F. Supp. 2d 1266 (S.D. Fla. 2004) (citing B.V. Bureau Wijsmuller v.

United States, 702 F.2d 333 (2d Cir. 1983)).  Those elements include:

1.      labor expended by the salvors in rendering the salvage service;

---

[3]  The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

12

2.      promptitude, skill, and energy displayed in rendering the service and saving the property;

3.      value of the property employed by the salvors in rendering the service and the danger to which such property was exposed;

4.      risk incurred by the salvors in securing the property from the impending peril;

5.      value of the property saved; and

6.      degree of danger from which the property was rescued.

Id.; see also The Blackwall, 77 U.S. 1 (1869).   Plaintiff contends that additional factors contained in the International Convention on Salvage of 1989 must be considered, including the skill and efforts of the salvors in preventing or minimizing damage to the environment; the measure of success obtained; the time used and expenses and losses incurred by the salvors, the availability and use of vessels or other equipment intended for salvage operations, and the state of readiness and efficiency of the salvor's equipment and the value thereof.[4]


## 1.  Labor, Skill and Property Used by Cape Ann

Cape Ann expended some labor, skill and energy in rendering the salvage service to the M/Y SITUATIONS.  Cape Ann did promptly respond with sufficient assets (trucks, pumps, manpower, tugboats) to render salvage assistance.  Cape Ann had its equipment in a fairly high state of readiness and efficiency, though one of its four pumps did not function.  Cape Ann was the only salvor to respond on the Sunday

---

[4] This Court has not found a published federal appellate opinion holding that the Convention has superceded the Blackwall factors.  Solana v. GSF Development Driller I, 587 F.3d 266, 272 (5th Cir. 2009) (assumed without deciding that the Convention is enforceable in United States courts).  The use of these additional factors do not change the result reached below.

morning of the incident.

Courteny Day was able to rather quickly diagnose the location of the incoming water and come up with a simple, yet effective method of temporarily stopping the incoming water until the vessel could be towed to a marina.  While Defendants deride the rag and tape method of stopping the water flow, the fact remains that Captain Day used his skill and energy to limit the damage to the vessel.  On the other hand, as Defendants note, Cape Ann's actions consisted primarily of a routine dock-side pump out of the M/Y SITUATIONS in approximately 90 minutes, with minimal expense and loss to Cape Ann.  On the whole, the factors that relate to Cape Ann's labor and skill put forth in this salvage operation merits a low to medium type of award.

## 2.  Risk and Danger

The salvage award elements that pertain to the risk incurred by the salvors in securing the property from the impending peril, the degree of danger from which the property was rescued, the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed all lead to the conclusion that an award in this case should be a low order award.  The Vessel was in low water depth, was tied to a dock in calm weather with no possibility of large boat traffic passing by due to its location near a fixed bridge, and did not have a high rate of water flow into the vessel.   These factors also minimized any risk to the salvor's property used in rendering service.  The only fact that could have created any danger is the possibility of water getting into the fuel tank, but whether this would in fact endanger any property is contradicted by the expert testimony.

### 3.  Environmental Damage Prevention

Both sides argue whether the salvage award should be enhanced or reduced

with regard to Cape Ann's skill and efforts in preventing or minimizing damage to the

environment from the oil and/or fuel on board the M/Y SITUATIONS at the time of the

incident.  Cape Ann asserts that its deployment of containment boom after noticing an

oily sheen on the water in the Vessel's engine room shows that its award should be

enhanced for protecting the environment.  On the other hand, Defendants contend that

the photographs in evidence of water being pumped from the Vessel outside the

containment booms shows that Cape Ann exacerbated any environmental damage.

Cape Ann responds to this contention with testimony that Captain Day was careful

about placing the suction line for the dewatering process below the level of the oily

sheen.

The Court concludes that the salvage award in this action should not be

enhanced nor reduced based upon the factor of preventing or minimizing damage to

the environment.  While there was no evidence that any damage occurred, there was

only minimal evidence of an actual threat to the environment.  While there was

evidence that Cape Ann took precautions to minimize any damage, there was evidence

that some of those efforts failed.  Therefore, this factor is excluded from the salvage

award calculation.

### 4.  Value of Property Saved and Success

Defendants contend that Plaintiff obtained limited success because the Vessel's

post-casualty value was limited to only its $200,000 scrap value, and because its expert

extrapolation of water flow evidence shows that only $159,000 in repairs was saved,

representing the approximate cost of further damage over the 27 hours following Cape

Ann's response, when owner's broker Nicholas McPherson would likely have discovered the vessel.  While the expert testimony of Drew Hains regarding the water flow extrapolation is intriguing, this evidence confirms the Court's conclusion that a low order award should be given, rather than supplying an alternative method of calculating that award.  The Court concludes that a more standard method of determining the post casualty value of the Vessel is to deduct the stipulated repair cost of $238,291.62 from the pre-casualty fair market value of $695,816.[5]  Thus, the figure of $457,524.38 for the Vessel's post-casualty value shall be used to compute the salvage award as the measure of the value of the property saved and the measure of success.

5.  Defendants' Claim of Overreaching/Plaintiff's Claim for Attorney's Fees

Defendants ask this Court to reduce the salvage award because Plaintiff overreached in its initial claim for an award of $187,510.  Plaintiff argues that it did not inflate its initial request because it was led to believe by Toby "Tuck" Phillips, the marine surveyor appointed to investigate the sinking by Defendants' insurer, that Cape Ann had performed pure salvage and would be compensated for its actions.  Plaintiff in turn accuses Defendants of litigating in bad faith by not stipulating sooner that the action was one of salvage, leading to Plaintiff incurring higher attorney's fees.

The Court concludes that the actions of the parties did not rise to the level of either overreaching or bad faith that would necessitate either a reduction of the salvage award or the remedy of attorney fees.  Southernmost Marine Services, Inc. v. One (1) 2000 Fifty Four Foot (54') named M/V Potential, 250 F. Supp. 2d 1367, 1380-81 (S.D. Fla. 2003) (citing Compania Galeana, S.A. v. Motor Vessel Caribbean Mara, 565 F.2d

---

[5]  See supra, ¶¶ 64-66.

358, 360 (5th Cir. 1978)).

## C.  Conclusion as to Salvage Award

The net effect of analyzing these factors is often summarized by a description of the salvage services as being either "high order" salvage or "low order" salvage and making an award accordingly.  It is clear that the services rendered to the M/Y SITUATIONS constitute a low order salvage.  Cape Ann contends it should be awarded a salvage award between 7% - 8% of the Vessel's salved value, with an equitable uplift for being a professional salvor of 1% to 2%.   Defendants argue that the award should be 5%.

The Court concludes that Plaintiff should receive a 5% award for this low order salvage plus a 1% uplift for being a professional salvor.  Triplecheck, Inc. v. Creole Yacht Charters Ltd., Case No. 05-21182-Civ, 2007 WL 917276 (S.D. Fla. 2007) (giving salvors a 2% uplift in their award due to their status as professional salvors).  Though "pure salvage" operations is not a significant part of their business, Cape Ann is a professional salvor.  Thus, the salvage award shall be 6% of $457,524.38, or $27,451.46.

## III.  CONCLUSION

The Court concludes that Plaintiff is entitled to prejudgment interest from the date of June 21, 2009, at the prime rate.  Sunderland Marine Mut. Ins. Co., Ltd. v. Weeks Marine Constr. Co., 338 F.3d 1276, 1280 (11th Cir. 2003).  The prime rate has remained unchanged since late 2008 at 3.25%.  Therefore, the award of $27,451.46 shall include prejudgment interest of 3.25% from June 21, 2009, to today's date, for a

total prejudgment interest award of $1,574.13.  The Court shall separately enter a final

judgment in favor of Plaintiff based upon these findings of fact and conclusions of law.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, this 29th day of March, 2011.

JAMES I. COHN
United States District Judge

copies to:

counsel of record on CM/ECF

18